# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CASE NO. 6:20-CR-00246-01** |
| **VERSUS** | **JUDGE JAMES D. CAIN, JR.** |
| **GERARD LATHON SMITH (01)** | **MAGISTRATE JUDGE CAROL B. WHITEHURST** |

## REPORT AND RECOMMENDATION

Before the Court is Defendant's Motion to Suppress. (Rec. Doc. 27). The Government opposed the Motion (Rec. Doc. 31), and Defendant replied (Rec. Doc. 36). The Motion was referred to the undersigned magistrate judge for review, report, and recommendation in accordance with the provisions of 28 U.S.C. §636 and the standing orders of this Court. The Court conducted an evidentiary hearing on March 29, 2022 (Rec. Doc. 61) and June 22, 2022 (Rec. Doc. 69). Both the Government and Defendant filed post-hearing briefs. (Rec. Doc. 74 and 78 respectively). Considering the evidence, the law, and the arguments of the parties, and for the reasons fully explained below, it is recommended that Defendant's Motion be denied.

## Factual Background

Defendant was indicted on October 28, 2020 with possession with intent to distribute cocaine. (Rec. Doc. 2). He appeared and was arraigned on November 20, 2020 and was detained pending trial. (Rec. Doc. 14; 15).

Defendant filed the Motion to Suppress at issue on August 1, 2021 seeking to suppress evidence obtained during an October 16, 2020 traffic stop. On that date, at approximately 12:30 a.m. then-officer Tory Miller, interdiction agent with the Lafayette Parish Sheriff's Office (LPSO), was patrolling eastbound Interstate 10 when he observed Defendant, driving a Toyota Camry, veer to the right side of the lane and hit the fog line. (Rec. Doc. 61, pp. 10-11; 34). Agent Miller activated his lights and pulled Defendant over. Initially, he believed Defendant was intoxicated. (*Id*. at pp. 11-12). In response to Agent Miller's questioning, Defendant stated that he had rented the car two weeks earlier; however, review of the rental papers revealed that Defendant had actually rented the vehicle that day. (*Id*. at pp. 12-13). Defendant also stated that he was coming from Louisiana; however, Agent Miller's license plate reader (LPR) inquiry revealed that he had actually come from the Beaumont area of Texas about an hour and a half earlier. (*Id*. at pp. 13-14; 35-36). Thereafter, Defendant was reluctant to answer further questions and refused to give his itinerary. (*Id*. at p. 14). Agent Miller described Defendant as seeming nervous,

because he avoided eye contact and held his hands behind his back during the interaction. (*Id*. at pp. 54; 56).

Agent Miller testified that he suspected Defendant had done a "flip trip," which he described as a trip to and from Texas, where several narcotics source cities are located, in a single day. In Agent Miller's experience, such trips were usually made in rental cars so that drug traffickers did not leave a paper trail with a particular vehicle. (*Id*. at pp. 15-17).

When Agent Miller returned to his unit to run Defendant's driver's license, he radioed LPSO canine handler Officer Lam Bui to come as backup. (*Id*. at p. 15). Agent Miller did not at that time commit to having Officer Bui use his drug dog. It was not until Agent Miller discovered that Defendant had several prior convictions for narcotics trafficking and that Defendant was on probation, and after Defendant refused consent to search the vehicle, that Agent Miller asked Officer Bui to run the dog. (*Id*. at pp. 17-18). Agent Miller's body camera footage corroborates his testimony.[1] (Rec. Doc. 57-1 Ex. 1).

Officer Bui was in the LPSO narcotics unit on criminal patrol and a canine officer patrolling that night with his canine, Thor. (Rec. Doc. 61, pp. 80-81). The officers' body camera footage shows that Agent Miller called Officer Bui

---

[1]    Agent Miller's body camera did not capture Defendant or his vehicle prior to the initial stop. Dash camera footage was not provided.

approximately six minutes after the initial stop, and Officer Bui arrived on the scene approximately two minutes later. (Rec. Doc. 57-1, Ex. 1 and 2). Upon arrival, after speaking with Agent Miller, Officer Bui dismounted Thor, put him in the sit position, and gave the command to begin sniffing the vehicle. During the sniff, Thor "keyed up" on Defendant, lunging at him, because Thor, who is both a drug dog and an apprehension dog, considered Defendant a threat. Therefore, Officer Bui asked Agent Miller to move Defendant back. He re-set Thor and gave the command to recommence sniffing. During the recommenced sniffing, Thor kept looking at Defendant, so Officer Bui again asked Defendant to move back and again re-set Thor to begin another sniff. Thor was more focused from that point. (Rec. Doc. 61, pp. 86-88).

Once focused, Thor sniffed around the vehicle and alerted by sitting near the passenger side door seams twice and once near the driver's side door seams. Officer Bui's body camera captured two of the three positive alerts and corroborated Officer Bui's testimony. (Rec. Doc. 61, p. 89; 93; Rec. Doc. 57-1, Ex. 1 and 2). Ultimately, the officers' search of the vehicle uncovered a kilo of cocaine in a bag in the trunk, marijuana in the center console, three cellphones, and a small amount of cash which was returned to Defendant. (Rec. Doc. 61, pp. 19-20; 94-96). Defendant now seeks suppression of the evidence seized on the grounds that the officers' search occurred during an unlawful detention and that the canine Thor was unreliable.

## Law and Analysis

Defendant's Motion to Suppress invokes the exclusionary rule, as it seeks to preclude the Government from introducing at trial certain evidence, specifically the drugs uncovered in the search of Defendant's vehicle during the traffic stop. "The exclusionary rule was created by the Supreme Court to 'supplement the bare text' of the Fourth Amendment, which 'protects the right to be free from 'unreasonable searches and seizures,' but ... is silent about how this right is to be enforced.'" *United States v. Ganzer*, 922 F.3d 579, 584 (5th Cir.), *cert. denied,* 140 S. Ct. 276 (2019), citing *Davis v. United States*, 564 U.S. 229, 231 (2011). The exclusionary rule operates to exclude the prosecution from introducing evidence obtained unconstitutionally. *Id*. Its purpose is to deter officer misconduct, not to redress injury to the victim of a constitutional violation or to address judicial errors or misconduct. *Id*., citing *Davis v. United States*, 564 U.S. 229, 236-37 (2011), and *United States v. Leon*, 468 U.S. 897, 916 (1984). Thus, the Supreme Court recognized a good faith exception to the exclusionary rule, which allows admission at trial of "evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate" but later invalidated. *Id*. citing *Leon*.

Generally, "the defendant has the burden of proving, by a preponderance of the evidence, that the material in question was seized in violation of his constitutional rights." *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993). In cases

such as this, where the officer acted without a warrant, the Government bears the burden of proof. *Id; United States v. Castro*, 166 F.3d 728, 733, fn. 6 (5th Cir. 1999).

## I.    Whether the traffic stop was lawful.

In a case involving a traffic stop, such as this, the Fifth Circuit set forth the applicable law as follows:

> The reasonableness of traffic stops and investigative detentions of persons suspected of criminal activity is evaluated through a two-step inquiry under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See United States v. Stevens,* 487 F.3d 232, 244 (5th Cir.2007). First, we determine whether stopping the vehicle was initially justified by reasonable suspicion. Second, we evaluate whether the officer's actions were reasonably related in scope to the circumstances that justified the stop. In the context of a traffic stop, once an officer's initial suspicions "have been verified or dispelled, the detention must end unless there is additional reasonable suspicion supported by articulable facts." *United States v. Estrada,* 459 F.3d 627, 631 (5th Cir.2006).

> *United States v. Powell*, 732 F.3d 361, 369 (5th Cir. 2013).

Applying the foregoing two-step analysis, the Court must first determine whether the initial stop was justified by reasonable suspicion. If Defendant did not, in fact, commit a traffic offense, the stop was unjustified. *United States v. Cole*, 444 F.3d 688, 690 (5th Cir. 2006).

### A. Whether the initial stop was valid.

When an officer observes what he objectively believes is a traffic offense, the decision to stop the vehicle is reasonable, regardless of the officer's subjective motivation or whether his true motive is to investigate unrelated criminal offenses.

*Id.* *Whren v. United States*, 517 U.S. 806, 810; 813 (1996); *United States v. Sanchez–Pena*, 336 F.3d 431, 437 (5th Cir. 2003).

Agent Miller testified that he initiated the traffic stop after observing Defendant cross the white fog line, potentially exhibiting a sign of intoxication. (Rec. Doc. 61, p. 11-12). He believed Defendant had violated Louisiana revised statute 32:79, which provides that "[a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety." Courts have found officers justified in stopping drivers for suspected intoxication based on their vehicles crossing the white fog line. See e.g. *State v. Waters*, 2000-0356 (La. 3/12/01), 780 So. 2d 1053, 1057 and cases cited therein. See also *Sanchez-Pena*, 336 F.3d at 437. The Court agrees that Agent Miller was justified in initiating the stop. Defendant offered no counter evidence to show that he had not crossed the fog line.

Instead, Defendant urges the Court to discredit Agent Miller's testimony regarding the infraction based on Agent Miller's purported lack of experience and imperfect professional record. Agent Miller testified that he had been in law enforcement since 2015 or 2016 and had worked for three different agencies, including two stints at LPSO. At the time of Defendant's arrest, Agent Miller had been an LPSO interdiction agent for less than six months. (Rec. Doc. 61, p. 56-60).

Agent Miller admitted that he had been disciplined while working at LPSO. He admitted to having pulled his weapon on compliant suspects during narcotics arrests and to having issues at times when engaging with the public, for which he received remedial training. He was never disciplined for dishonesty. He also acknowledged having received poor evaluations in some areas, but his supervisors expressed optimism for his success as an officer. (Rec. Doc. 61, pp. 21-23; 61-63; 69-71. See also Agent Miller's personnel records at Rec. Doc. 58-2).

The Court found Agent Miller to be a credible witness despite his personnel records. The video footage shows that Agent Miller was professional at all times during the traffic stop and engaged with Defendant in a professional manner. Agent Miller was never disciplined for being dishonest and the Court found no reason to discredit his testimony about this case. Accordingly, the Court finds that Agent Miller was justified in initiating the traffic stop upon observing Defendant cross the white fog line in violation of La. R.S. 32:79.

### B. <u>Whether the prolonged detention was valid.</u>

Having found that Agent Miller's initial stop was justified by reasonable suspicion, the Court must determine whether the officers' actions were reasonably related in scope to the circumstances justifying the stop. A traffic stop based on reasonable suspicion that the defendant has violated a traffic law "cannot continue for an excessive period of time or resemble a traditional arrest." *Hiibel v. Sixth*

8

*Judicial Dist. Court of Nev., Humboldt Cty.,* 542 U.S. 177, 185-86 (2004). "[A] traffic stop 'can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a warning ticket." *Rodriguez v. United States*, 575 U.S. 348, 354–55 (2015), quoting *Illinois v. Caballes,* 543 U.S. 405, 407 (2005). "The time reasonably required to complete the mission of issuing a traffic ticket can include the time it takes to inspect the driver's license, automobile registration, and proof of automobile insurance; run computer checks; determine whether there are outstanding warrants against the driver; and ask the purpose and itinerary of the trip." *United States v. Spears*, 636 F. App'x 893, 901 (5th Cir. 2016), citing *Rodriguez,* 135 S.Ct. at 1615 and *United States v. Pack*, 612 F.3d 341, 350 (5th Cir.), *opinion modified on denial of rehearing*, 622 F.3d 383 (5th Cir. 2010). "An officer's subsequent actions are not reasonably related in scope to the circumstances that caused him to stop the vehicle if he detains its occupants beyond the time needed to investigate the circumstances that caused the stop, unless he develops reasonable suspicion of additional criminal activity in the meantime." *United States v. Berry*, 664 F. App'x 413, 418 (5th Cir. 2016), *as revised* (Dec. 14, 2016), quoting *Pack*, 612 F.3d at 350. See also *United States v. Andres,* 703 F.3d 828, 833 (5th Cir.2013).

The Fifth Circuit recently summarized the standard of reasonable suspicion as follows:

A reasonable suspicion consists of "specific and articulable facts ... taken together with rational inferences from those facts" that reasonably suggest "criminal activity [is] afoot." Although reasonable suspicion cannot consist simply of an officer's hunch that an individual is engaged in illegal activity, only "some minimal level of objective justification" is required. In our review, we must consider the "totality of the circumstances" that confronted the law enforcement officer. Observations that by themselves are susceptible to innocent explanations, when taken together, can still amount to reasonable suspicion. "In considering whether officers reasonably suspect someone of criminal activity, we defer to their law enforcement experience, recognizing that trained officers may draw inferences from certain facts 'that might well elude an untrained person.'"

*United States v. Burgos-Coronado*, 970 F.3d 613, 619 (5th Cir. 2020) (citations omitted).

The officers' body camera footage shows that Agent Miller pulled Defendant over at 5:38.[2] Within five minutes, Agent Miller discovered that 1) Defendant had lied about how long he had rented the car; 2) Defendant had lied about his itinerary, and 3) Defendant had driven from Louisiana to the Beaumont, Texas area, a known narcotics source city, and back, in one day, which comported with Agent Miller's understanding of a "flip trip." Within eight minutes, Agent Miller further learned that Defendant had a criminal history for narcotics trafficking and was on probation at the time. (Rec. Doc. 61, pp. 12-18). Agent Miller also testified that Defendant appeared nervous by avoiding eye contact and holding his hands behind his back.

---

[2]    Agent Miller testified that the stop occurred at approximately 12:30 a.m. on October 16, 2020. (Rec. Doc. 61, p. 32). See also data from Agent Tory's LPR system at Rec. Doc. 58-1, p. 1. The video footage timestamp commences at T05:37:43. The Court shall refer to the video time stamp for ease of reference.

(Rec. Doc. 61, pp. 54; 56). These facts, all occurring within five to eight minutes of the initial stop, support Agent Miller's reasonable suspicion that Defendant was engaged in criminal activity, thereby justifying prolonged detention until the drug dog arrived.

Officer Bui and Thor's sniff search began within ten minutes of the initial stop. (Rec. Doc. 57-1). "A canine 'sniff' test is not a 'search' for Fourth Amendment purposes and is exempt from the probable cause requirement so long as the dog does not enter the home or vehicle." *United States v. Powell*, 732 F.3d 361, 373 (5th Cir. 2013). Further, a drug canine's alert to the presence of drugs constitutes probable cause to search a vehicle. *Sanchez-Pena*, 336 F.3d at 444. "When dealing with a probable-cause challenge to a drug dog's alert, '[t]he question—similar to every inquiry into probable cause—is whether all the facts surrounding [the] dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime.'" *United States v. Shen*, 749 F. App'x 256, 261 (5th Cir. 2018) (unpublished), quoting *Florida v. Harris*, 568 U.S. 237, 133 S.Ct. 1050, 1058, 185 L.Ed.2d 61 (2013). "A sniff is up to snuff when it meets that test." *Id.*

The Court assumes for this analysis that canine Thor is reliable. Thor alerted to the presence of drugs, and therefore provided probable cause for search of the vehicle, within eleven to twelve minutes of the stop. The Fifth Circuit considered a

factually similar case in *Pack*. In that case, the court found that prolonged detention to allow a canine sniff was justified when the officer developed reasonable suspicion after a traffic stop based on the defendant's extreme nervousness, conflicting stories, and suspended license. *Pack*, 612 F.3d at 361. Eight minutes elapsed between the time of the officer's final computer check and discovery of the defendant's criminal record and the time of the drug dog's arrival. The court deemed the thirty-five-minute total detention time (from the time of the stop to the discovery of the drugs after the canine sniff) to be reasonable.

In this case, the pertinent facts unfolded in even less time. Officer Bui and Thor arrived nearly contemporaneously with Agent Miller's computer checks, which revealed Defendant's criminal history and probation. The search commenced within ten minutes of the initial stop, and Defendant was arrested within fifteen minutes of the initial stop. The Court finds that Agent Miller's reasonable suspicion, together with Thor's positive alerts for the presence of drugs, occurred within a reasonable timeframe. Thus, assuming Thor was reliable, the search was valid and efficient.

Defendant argues this case is akin to *Rodriguez v. United States*, in which the Supreme Court held that absent reasonable suspicion, prolonged detention to conduct a dog sniff constitutes an unconstitutional seizure. *Rodriguez v. United States*, 575 U.S. 348, 135 S. Ct. 1609 (2015). *Rodriguez* is inapposite because Agent

Miller had reasonable suspicion that Defendant was engaged in criminal activity. The officer in *Rodriguez* did not. *Id.* at 352.

Defendant also suggests that Agent Miller lacked reasonable suspicion for further inquiry after dispelling his initial concerns that Defendant was intoxicated; however, the Fifth Circuit does not require particularized suspicion of a specific crime. *Pack*, 612 F.3d at 355. Reasonable suspicion of *any* criminal activity is sufficient. Though after the initial stop Agent Miller no longer suspected intoxication, he had reasonable suspicion of other criminal activity as discussed above. Therefore, the search of Defendant's vehicle and his arrest were constitutional.

### II.   <u>Whether the canine Thor's sniff was valid.</u>

Defendant next challenges canine Thor's reliability. The Supreme Court has held that a drug canine's positive alert for the presence of drugs constitutes probable cause unless the dog is found to be unreliable:

> [E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert. If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs. After all, law enforcement units have their own strong incentive to use effective training and certification programs, because only accurate drug-detection dogs enable officers to locate contraband without incurring unnecessary risks or wasting limited time and resources.

13

A defendant, however, must have an opportunity to challenge such evidence of a dog's reliability, whether by cross-examining the testifying officer or by introducing his own fact or expert witnesses.

*Fla. v. Harris*, 568 U.S. 237, 246–47, 133 S. Ct. 1050, 1057, 185 L. Ed. 2d 61 (2013).

Officer Bui has been a certified canine handler for over five and one-half years. Thor is a patrol and apprehension dog, or "bite dog." They have been working together since 2018. They are required to be certified annually, and they train weekly together. They are certified through the National Police Canine Association (NPCA) and U.S. K9. Thor has never failed and had never given a false indication while working with Officer Bui. Thor may alert where no drugs are found; however, Agent Bui testified that such instances are due to the odor of drugs remaining, though the drugs may have been removed, such as if an individual smoked marijuana before riding in a car. (Rec. Doc. 61, p. 80-84; 99-114).

**A. The Experts.**

In support of his arguments that Thor is unreliable, Defendant relies on the testimony of purported expert, Kyle Heyen. Defendant tendered Mr. Heyen as an expert in the field of police drug dog handling, training, certification, and administration. (Rec. Doc. 69, p. 85). The United States challenged Mr. Heyen's qualifications as an expert and offered its own expert, Sgt. Wendell Nope.[3]

---

[3]    The Court deferred ruling at the hearing on whether Mr. Heyen qualifies as an expert. Rec. Doc. 69, p. 95.

According to Mr. Heyen's curriculum vitae, he has been a consultant on issues regarding dogs, training, and law enforcement since 2004. (Rec. Doc. 41-3). His expert report in this case indicates that he is a certified law enforcement officer with specialized training, as well as a service dog handler (drug/patrol), an instructor in all areas of K9 law enforcement training, and he was the first law enforcement officer trained and certified to the standards of the German Police in the United States as a judge in all aspects of law enforcement canines (patrol, tracking, drug/explosive detection, agility, obedience). (Rec. Doc. 58-1, p. 236). In support of his qualifications, Mr. Heyen testified that he trained dogs from 1987 through 2002 or 2004. He was trained as a handler in the 1980s by the Government's expert, Sgt. Nope, went on to train approximately 500 dog and handler teams, and was a judge for law enforcement dogs. (Rec. Doc. 69, pp. 81-84). Nevertheless, he had not been a member of any police dog organization in the prior 25 to 30 years, because he did not agree with the certification and training methodologies of those organizations. He had not attended any training in his field since 1990 and had not trained any dogs for around twenty years. (Rec. Doc. 69, pp. 85-92; see also Mr. Heyen's curriculum vitae at Rec. Doc. 43-1). Mr. Heyen rebuked NPCA's standards for certification in his report and opined that the German Police Drug Dog Certification standards are more appropriate. (Rec. Doc. 58-1, pp. 249-50).

The Court accepts Mr. Heyen as an expert in the fields of drug dog handling and training but declines to accept Mr. Heyen as an expert in the field of drug dog certification and administration (to the extent administration concerns certification).[4] Mr. Heyen did not provide sufficient information supporting his qualifications to testify regarding acceptable standards for certification organizations. He has not been a member of any bona fide organization or attended any pertinent training for twenty-five to thirty years. He has not published any scholarly articles on the certification standards he believes are more appropriate. (Rec. Doc. 69, pp. 85-93).

The Government tendered Sgt. Wendell Nope as an expert in the fields of canine and police dog handling, training, certification, deployment, and auditing. Sgt. Nope is a retired sergeant and K9 training supervisor for the Utah Peace Officer Standards and Training Division of the Utah Department of Public Safety. His eighteen-page curriculum vitae references numerous awards and certificates over many years as police dog instructor, supervisor, and judge. He was the editor of a national police dog professional journal and authored numerous articles, books, and manuals in his field. (Rec. Doc. 66-1, pp. 1-18). In addition, he maintains relationships with the National Police Canine Association (NPCA) and other such organizations, as well as with government agencies in order to stay aware of new

---

[4]    The Court is unclear about what Defendant terms drug dog "administration." To the extent "administration" refers to training and handling, the Court shall consider Mr. Heyen as an expert.

technology and practices in the industry. (Rec. Doc. 69, pp. 6-15). The Court accepted Sgt. Nope as an expert in the tendered fields. (Rec. Doc. 69, p. 24).

**B. Defendant's challenges to Thor's reliability.**

1. Thor's certifications.

Defendant first challenges Thor's reliability on the grounds that he was not certified by a bona fide organization and that he was not certified to detect certain drugs at certain times. The evidence shows that Thor was certified by NPCA in November 2019 to locate cocaine, marijuana, methamphetamine, and heroin, and certified the following year in November 2020 (about one month after the arrest in this case) to locate cocaine, marijuana, methamphetamine, heroin, and MDMA (Rec. Doc. 61, pp. 164-65; Rec. Doc. 58-1, pp. 220-22; 226-27).

Sgt. Nope testified that the NPCA is an organization of over a thousand members who have attempted to establish reasonable training and certification standards. He classified NPCA as a bona fide organization for training and certification of police dogs, as required by *Florida v. Harris, supra*. (Rec. Doc. 69, p. 25-28). NPCA certification has been accepted by at least three federal circuit courts of appeal, including the Fifth Circuit, and numerous district courts throughout the country as evidence of a drug dog's reliability. See *United States v. Shen*, 749 F. App'x 256, 261 (5th Cir. 2018); *United States v. Smith*, 448 F. App'x 936, 939 (11th Cir. 2011); *United States v. Braddy*, 11 F.4th 1298, 1312 (11th Cir. 2021). The Court

finds that the NPCA is a bona fide organization and that Thor and Agent Bui were properly certified at the time of the search to locate the drugs discovered in this case, cocaine and marijuana.

    2. Thor's conduct.

Defendant next challenges Thor's reliability based on his (Thor's) aggressive behavior and the fact that he was distracted by Defendant. The officers did not dispute that Thor is an aggressive dog, and that he lunged at Defendant during the search. Officer Bui explained that Thor is a dual-purpose dog, trained to both detect drugs and apprehend. Thor "keyed up on" or lunged at Defendant during the search, because, as Officer Bui testified, Thor considered Defendant to be a threat. (Rec. Doc. 61, p. 86-87). Once Defendant was moved further away, Thor was refocused on the search and did his job. (Rec. Doc. 61, p. 88-89).

Sgt. Nope testified that, although Thor's aggressive behavior toward Defendant was not typical of a canine sniff, once Officer Bui re-set Thor, he sniffed the vehicle normally. (Rec. Doc. 69, p. 37). Thor then alerted to an odor at the driver's door before coming to a sit, thereby indicating he had sniffed a drug odor, at the passenger's door and again at the driver's door where he had earlier alerted. Sgt. Nope explained that an alert is a dog's natural reaction to a known odor; whereas, an indication is a dog's trained response to a detected odor, in this case a sit. (Rec. Doc. 69, pp. 38-39). Sgt. Nope concluded that Thor performed a reliable

sniff and that he performed according to his training and consistent with his prior performances. (Rec. Doc. 69, pp. 40-41). He had no doubts that Thor's sniff was valid. (Rec. Doc. 69, p. 46).

Mr. Heyen disagreed. He testified that Thor's alert was unreliable because he was distracted by Defendant and, once he was sniffing, "he just came, put his head up and he sat [and had] no increased intensity or focus," or other outward signs. (Rec. Doc. 69, pp. 106-107). However, Sgt. Nope testified that many dogs are trained to indicate with a sit and stare towards the handler. (Rec. Doc. 69, pp. 75-76). Officer Bui testified that Thor, who he had worked with successfully since 2018, indicated to the presence of drugs by sitting. (Rec. Doc. 61, pp. 82; 93; 106-108; 114). Accordingly, the Court finds that Thor's conduct in this case, though initially atypical, did not render his sniff and indication for the presence of drugs unreliable.

### 3. Thor's training.

Defendant last challenges Thor's reliability based on insufficient training. The testimony and training records show that Officer Bui and Thor trained weekly. Although they occasionally missed a session and only a portion of the training concerned narcotics specifically, the evidence shows that Officer Bui and Thor completed routine training, had completed all weekly trainings in the month of October 2020, and that Thor successfully located narcotics in each session. (Rec. Doc. 61, pp. 109-111; 129-34; Rec. Doc. 58-1, pp. 121-81).

19

Mr. Heyen opined that Thor's training records were incomplete and that he had insufficient training, because training records show that he was only sniffing during each training session for mere minutes. Based on Mr. Heyen's calculation, Thor had only trained for two hours and thirty-four minutes throughout the entire year of 2020. In support of his conclusion, Mr. Heyen relied on standards promulgated by the Scientific Working Group on Dog and Orthogonal Detector Guidelines, or "SWGDOG,"[5] which recommends four hours of training per week. (Rec. Doc. 69, pp. 98-100).

Sgt. Nope discredited Mr. Heyen's calculation of Thor's training as based on "nose time," or the length of time the dog is actually sniffing. Sgt. Nope stated that such a calculation is a skewed statistic in law enforcement dog training practices, because it does not consider setup, preparation, takedown, research, interview, and other time periods associated with deployment of a dog. (Rec. Doc. 69, pp. 44-45). Further, although SWGDOG recommendations state that a canine team shall complete a minimum of sixteen hours of training per month, the guidelines do not define training as a value of nose time or limit the training requirement by type (i.e. narcotics, apprehension, etc.) as Mr. Heyen suggests. Moreover, the SWGDOG recommendations provide that training conducted solely by the handler is

---

[5]     Sgt. Nope described SWGDOG as a scientific working group that works with the federal government to research and resolve critical issues and establish best practices for law enforcement utilizing canines. (Rec. Doc. 69, pp. 9-10).

acceptable, provided it is periodically combined with supervised training. (Rec. Doc. 58-1, pp. 261-62). Officer Bui testified that he and Thor do five-hour trainings weekly, which includes various types of training, such as apprehension, tracking, building, and area search. (Rec. Doc. 61, pp. 132).

After analyzing Thor's training records, Sgt. Nope concluded that Thor had a 99% accuracy rate during training and 84% accuracy rate during deployment (i.e. non-training situations in which he was deployed), both of which were well within the acceptable professional standard of reliability and credibility. (Rec. Doc. 69, pp. 79-80). The Court disagrees with Mr. Heyen's assessment of Thor's training and finds that Sgt. Nope's opinion substantially outweighs Mr. Heyen's opinion. Thor was not unreliable due to training.

This Court is not the first to favor Sgt. Nope's expert opinion over that of Mr. Heyen. See e.g. *United States v. Gomez*, 444 F. Supp. 3d 739, 746 (M.D. La. 2020), *aff'd,* 855 F. App'x 989 (5th Cir. 2021); *United States v. Poole*, No. CR13-3003-MWB, 2013 WL 1694776, at *15 (N.D. Iowa Apr. 18, 2013), *report and recommendation adopted,* No. CR13-3003-MWB, 2013 WL 3808243 (N.D. Iowa July 22, 2013); *United States v. Simeon,* 115 F. Supp. 3d 981, 1002 (N.D. Iowa 2015). The Court finds that Sgt. Nope's conclusions substantially outweigh Mr. Heyen's opinions because of Sgt. Nope's superior qualifications and the fact that his conclusions comport with the evidence reviewed in this case, including the officers'

testimony, video footage, and Thor's certification and training records. Having found that canine Thor was reliable, the Court finds that his alert on the drugs in the car constituted probable cause to search the vehicle.

## Conclusion

For the reasons discussed herein, the Court recommends that Defendant's Motion to Suppress (Rec. Doc. 27) be denied.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and Fed. R. Crim. P. 59(b), parties aggrieved by this recommendation have fourteen days after being served with a copy to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after being served with of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of its service, or within the time frame authorized by Fed. R. Crim. P. 59(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error. See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. §636(b)(1).

THUS DONE in Chambers, Lafayette, Louisiana on this 30th day of September, 2022.

_____
CAROL B. WHITEHURST
UNITED STATES MAGISTRATE JUDGE